I represent the appellant, Anthony Shane Scott, to help frame the issues. Entering the Scott's garage without a warrant, officers subsequently go to the interior of the home, finding weapons. Could you get your mic a little closer there? Thank you, Judge. They ultimately enter the home after the warrantless entry into the garage, finding weapons. That leads to Mr. Scott's conviction for being a felon in possession and a 110-month sentence. The issues for us to resolve and debate today are whether the warrantless entry is justified by one of four possible exceptions. The emergency aid exception or exigent circumstances exception. Whether Mrs. Scott gave an implied consent prior to the entry into the garage. Whether a later post hoc written express consent by Mrs. Scott justified the warrantless entry. And finally, could it be justified as a parolee under the parolee search doctrine. These, I believe, are the essential facts. We'll only need one, right? Only need one to take the day, that's clear. Essential facts down in Fulton County on the Missouri border, rural area. Officers respond to burglar alarms at the Scott residence. They go down and meet Mr. Scott at a locked gate. To describe the property a little bit further, it's a rural area. The gate is about a third of a mile off the closest public road. Then the home through the gate is another 100 to 200 yards. Mr. Scott presents there with a pickup truck that's got the windows busted out. He's in pretty bad shape, bloody. He says to the officers, my wife has shot at me and has run me over with this truck. Other officers assemble and he continues to tell that version. At that point, then suspecting that he is the victim, I think there are seven officers by this time. They caravan in several vehicles down to the home. You'd agree at that point there's exigent circumstances, right? I agree. The district court found at that point it's an exigent situation. They enter and go up to the garage. Correct. Here's what they see, Judge. When they arrive at the home, it's a two-panel garage. One of the doors is open. Sitting inside is Mrs. Scott chatting on a cell phone, smoking a cigarette. At that point, as the district court found, the exigent circumstances dissipated. Wouldn't it still be a concern because at that point there was concern for child welfare, wasn't there? Did that not continue? The district court found that it did not. I think it's on page four of the district court's order. Judge Wright did find exigent circumstances are existing there at the gate. Once the officer spoke with Stacy in the garage and saw the small children about whom the defendant was worried and determined they were all safe, all exigent circumstances disappeared. Of course, I agree with that proposition. At that point, Stacy was obviously, and the officers admit this on the stand, not in need. She's not injured. She's not in need of any aid. She's calm, smoking a cigarette, chatting on the phone. I suggest to you that the district court is right that the exigent circumstances had dissipated at that point. That was probably only after they talked to her and determined that she was not the person shooting people and that the kids were safe, right? It's sort of a typical... They certainly couldn't have told that as they pulled up and looked at the two-panel garage door. I think so, Judge. I think they could. And that's my interpretation of this evidence. Sort of a typical suppression hearing with seven officers testifying about events a year later. The record is a bit fuzzy. But I read the record to say once the two initial officers came and approached, standing outside of the garage, saw her smoking a cigarette, chatting on the phone, saw she was not injured... That's not what the district court found. The district court found after talking with her, they were able to determine that there were no more exigent circumstances. I'm not exactly sure I read the order that way. Well, you just read that to me, I thought. Yeah, I'm not sure about the chatting. And where then the chatting occurs, there is a suggestion in the record that they begin chatting with her outside. I'd say more than a suggestion. The record is clear that then they move into the garage past the threshold and then either begin or continue the conversation, which of course continues to dissipate any exigency. Crossing the threshold was at her invitation, right? I don't believe so. No, in fact, I do not believe it. So when we get into the implied consent issue is all they knew standing outside was what they were able to observe. They did not... she did not invite them in. She made no gesture. There was absolute silence on her part. There was no invitation by her to enter into the garage. Now, subsequently, Your Honor, she invites them into the home itself through the garage door. That's what I meant by crossing the threshold. And that's clear. But I'm suggesting that the dividing line here, the Fourth Amendment wall, is built right there at the threshold of the garage. That's the warrantless entry. Okay, but until they engaged her in discussion, why would the exigent circumstances, just because she was smoking a cigarette? I mean, she could have put the gun up against the wall, you know, still had the kids in peril and been sitting there smoking a cigarette. Until you talk to her, I don't think that the exigent circumstances would have dissipated. Except that was not the testimony of several of the officers. Their testimony was coming to the front, sitting there, seeing her sitting down calmly, smoking, chatting, seeing the child or children. It's unclear. At that point, we weren't concerned for our safety. And I believe that's Rourke's testimony and Frank's. So why doesn't consent get them the rest of the way? Because at that point, she says, come on in. At that point, she says, come on in. But already the Fourth Amendment violation has occurred once they crossed the threshold into the garage. And so, again, there being no, she didn't do anything to suggest to them you were invited to come into this garage. She didn't do anything to exclude them either. True. That's absolutely correct. And that sort of reminds me of some old guilty plea cases from the Supreme Court. You can't take as an affirmation something from when there's just silence. She didn't do anything. In all the cases that both the government and I have cited on the complied consent, there is some act. You're either verbally inviting them or there is some affirmative act, as I call it in my brief, the opening the door and stepping back theme of four or five cases. The description seems to almost sound like she's expecting them to come in with her into the garage and come with her into the house. This is all going to be on alarm system video. Come on in. I'll show you the I'll show you the tape. She does. But and so reasonable reasonableness being the linchpin here. What would a reasonable officer do in this in these circumstances? There's nothing different between a lay person and officer. There's no expertise that an officer has standing outside of a garage and whether they enter or not. It's just like if I saw my neighbor sitting in his garage, reasonably, what would I do? I wouldn't just walk into the garage and say, hey, Steve. I would stand outside and say, Bob, can I come in? And that's the practical part of this case. There was no reason for the officers to breach that threshold without either an invitation, express or implied. And my suggestion to you was not implied because she didn't do anything. There had to be some affirmative act on her part that implied an invitation to enter. And then, like I said, the cases that we've all cited, there is some specific thing that the person did that indicated to the police. Well, we're we're we're free to enter. We're being invited into this home. It seems like this is hard to put oneself in the position of the police there as they approach to what a reason would reasonable officers here think they were being. That that they were violating the privacy when the person is so calm, so polite, seeming to encourage their arrival and come in to to learn what actually has happened, wanting to explain it. It that seems not like the case where somebody is afraid. They're scared. They're suspicious. They they're trying to avoid disclosure. It just seems different. You don't have the objecting person. You don't have the locked door. And so, right. I think that the job that that has to be done in this case is what exactly privacy interest was invaded under these unique facts versus what legitimate needs did the officer have to enter that garage without a warrant? Well, let's assume then that that you're correct and that they did at that point. Why wouldn't her subsequent written consent win the day for the government? And that is a peculiar issue and brand wine. The case that seems to be the center of that debate is is sort of a curious opinion to me. The sort of factual paradigm in post hoc. Well, intervening circumstances is you have the the initial Fourth Amendment violation leading to the other end of the continuum, the obtaining of of the evidence. If what intervenes between those two is a valid consent, that valid consent purges the taint of the initial unlawfulness. Brand wine is confusing to me because I read the facts in one of two ways. On one hand, I read it to meet that paradigm, which is the factual paradigm that I read all of of of the consent purging the taint of the unlawful entry cases. I can read brand wine facts to suggest something else, that there was the initial illegal entry. Then there was the obtaining of the evidence. Then there is a post hoc consent. To the extent that that's the way those facts are, I believe that would be incorrectly decided. That's as if to say police barge into my home, search it, execute essentially a general warrant, rummaging through all my stuff, a blatant Fourth Amendment violation. Then come to me two days later and say, Mr. Hendricks, will you sign this consent? It's simply a post hoc justification that to the extent brand wine is read that way. I'm assuming it's not read that way. So in this case, we have that scenario. We have, again, I think, the unlawful warrantless entry, then the obtaining of the evidence, then a subsequent post hoc justification. And so I don't believe that that consent would purge the taint. There was nothing intervening between the initial illegality and the obtaining of the evidence to purge the taint of Step A. And other than that, that leaves the parolee search. And I don't know that I've got a great deal to add to it. It's at the moment that, as I read the record, the parole officer authorized the parole search. At that point, he did not have, there was no officer had any reasonable suspicion to believe that Mr. Scott had violated the terms of his parole. At that point, all they knew was they believed he was the victim. His wife had shot at him. You raised a Franks issue with respect to the search of the vehicle. Yes, sir. Government argued that it was moot because they represented they didn't intend to use any of that evidence. You didn't respond to that in your reply brief. So do you agree that you do? If it's a moot issue, if the government is not intending to introduce the evidence that was taken from the truck, then it is a moot issue. Did they make that representation? In fact, again this morning. OK, so you agree that it was moot. It is moot. I do. OK, thank you. If there are no further questions, I'll reserve the rest of my time. Thank you, Mr. Hendricks. Mr. McCree. May it please the court. I'm Cameron McCree, and I represent the United States in this matter. Your Honor, I believe this case, as the court already recognizes, it comes down to exigent circumstances that gets the officers into the garage when they're dealing with Ms. Scott. In that circumstance, they just heard from Mr. Scott that he's concerned about his children. And Chief Rourke testified that when he first got there, he got out of his car, crossed the threshold, examined Ms. Scott to see if she had a weapon, realized that she didn't. And it's only at that point he's not concerned about his own safety. But none of the officers say anything about the kids' safety until the kids come out of the house. And so the kids coming out of the house is the key to exigent circumstances ending. And at that point, the officers are already into the garage. Mr. Hendricks said that the officers testified that as they approached the garage, they never felt there was any safety concerns. Is that accurate? And I would point the court to, I believe it's page 221 of the transcript concerning Chief Rourke's testimony. He mentions that when he first sees Ms. Scott, he looks at her very carefully to see if she has a weapon, because if she does, that may be a threat to him. And so it's only then that his concerns are allayed. And so he's the one who enters the garage. And so his entry into the garage is what would still be under exigent circumstances. Is there any dispute about that fact that they entered the garage before the children exited the house? And, Your Honor, I believe if there is any dispute about that, the conflicting testimony should be resolved in favor of the court's finding. Because Chief Rourke does mention that the timeline that Chief Rourke sets out, it says that the kids aren't there until the conversation gets rolling. And that's after he would have engaged Ms. Scott in conversation, after he would have crossed the threshold. And so exigent circumstances still would have existed at the time the kids came out. And so there are several officers who are testifying, and some may have been unclear about the timeline. But looking at the Chief's timeline of events, which the court adopted in its findings of fact, that supports the court's findings because it is the Chief's recollection of what occurred. And so we would submit that the entry into the garage then turns to a consensual encounter when Ms. Scott wants to show the officers where the surveillance video is that particular day. And so from there, the consent issue becomes much easier. Because I believe that Mr. Scott focuses in his brief about what Ms. Scott did or did not do when she was sitting in the garage. But what that fails to recognize, though, is that once Chief Rourke is in the garage and the kids come out, Ms. Scott points out the fact that her kids know where the gun is, where Mr. Scott shot at both of them. And she asked her son to help the officers find the gun. In a case such as that, that's Ms. Scott inviting the officers. And this was the son that wasn't present. Is that because... I believe this was the son that was present, Your Honor, because he knew where his father threw the gun after the encounter occurred. I thought they had to call somebody at school. I thought they had to call a son at school to get knowledge of that. And there were two sons, Your Honor. I believe there was one son that was with her as she was going to Walmart, and Mr. Scott started to shoot at the vehicle that they were in. And he knew where the gun was. The gun out on the property as opposed to the gun stored in the house. Yes, Your Honor. And the gun stored in the house, they had to call the son at school to ask where the key was to find the key to that particular safe. And so we would submit that once the officers are in the house, that's a consensual encounter. And as the court has already recognized, one exception to the exclusionary rule is enough. I'll briefly lay out several other responses concerning the parole search. We submit there that Chief Warwick, again, he testified that he told Officer Clayton on the very first phone call that he had with him that he believed Stacey Scott said that Mr. Scott was doing the shooting. And so we acknowledge that Officer Clayton was somewhat confused about some of the facts. And he and Chief Warwick, their testimony was not entirely consistent. But again, it's the role of the district court who heard both witnesses that resolved that testimony, which was that Chief Warwick told Officer Clayton on the very first encounter that Mr. Scott was involved in the shooting. And that would be a parole violation. We also pointed out that the officers had a legitimate reason to be on the property, which was to deal with the emergency situation, to find out what the true story was. And the cases that we cited in our brief support that. That legitimate reason to be on the property is an exception to the exclusionary rule. And, Your Honor, we would also just rest on our briefs unless the court has questions about some of our alternative arguments. But we would strongly point the court to the fact that those accident circumstances resolved this particular case. I don't see any questions. Thank you, Your Honor. All right. Mr. Hendricks, your rebuttal. I think it is a confusing record. I'm looking, and I quote this in my brief. This is from, I forget if it's Chief Warwick, testified that Stacy was, quote, in the garage when I walked up there. He was asked by us, did you get past the threshold of the garage whenever you first spoke to her? Warwick responded, he did. In another place, it appears as if they're chatting outside, then walk in, and that's on page 190 of the transcript. The officers make it appear that, no, there was no conversation. They just made observations, felt secure, walked in. So, unfortunately, it's a fuzzy record to deal with. In the end, though, it's not really a subjective test. Right. His personal opinion really doesn't matter. We look at it objectively whether the exigent circumstances would have dissipated at that point in time, right? Absolutely, Your Honor. And so we look to those objective circumstances. And my suggestion, what I think, is objectively all they saw was a woman calmly sitting there smoking a cigarette, children playing, everything's taken care of. No emergency at that point. Thank you, Your Honor. Thank you, Mr. Hendricks. Mr. Hendricks, the court wants to acknowledge and express its appreciation for your service in this case under the Criminal Justice Act in providing representation for the appellate. Thank you for your willingness to serve.  All right.